PAREV PRODUCTS CO., Inc., v. I. ROKEACH & SONS, Inc.

No. 1471.

District Court, E. D. New York.

Jan. 29, 1941.

David Haar, of New York City, for plaintiff.

Jacob Aks, of Brooklyn, N. Y. (Fred L. Gross, of Brooklyn, N. Y., of counsel), for defendant.

CAMPBELL, District Judge.

This suit is brought by the plaintiff to obtain an injunction to permanently enjoin the defendant from making, selling or distributing a product known as Kea in claimed competition with a product known as Nyafat, on the theory that under an implied negative covenant of a written contract between the plaintiff and the defendant, the defendant could not sell or distribute the product known as Kea because that product could be used for similar purposes as the product known as Nyafat.

The defendant is a responsible concern and was established some fifty years ago. It sells cleaners, such as scouring powder, silver polish, soaps, food products used for cooking, frying, baking and shortening, soups, oils, honey and tea.

The contract refers to a product therein called "Parev Schmaltz", which under the right given to the defendant by the contract in question was changed to "Nyafat" by which name it will be called in this opinion.

Defendant sells and distributes, but does not manufacture, Kea, as that product is manufactured by Best Foods, Inc., which corporation sells the product to any one who desires to purchase, in wholesale quantities. For defendant the manufacturer packs the article Kea in cans with labels both of which are furnished by the defendant.

Defendant manufactures and sells Nyafat.

The basic ingredient of Nyafat is cocoanut oil 95 per cent, the balance hardened cottonseed oil, coloring and onion material, all cooked, stirred and strained before packing and packed in glass jars and labeled. In the product described, as Neutral Nyafat, of which but a very small quantity was sold or distributed by the defendant, there is no onion material. The basic ingredient of Kea is straight cottonseed oil hydrogenated and deodorized. No other oil is added, nor is there added any onion material or coloring and there is no cooking.

The customer gets 40 per cent more in quantity of Kea in buying the one pound can, than he or she does in buying Nyafat in the ten ounce jar, which is the way in which small quantities of those articles are packed, and which are sold for substantially the same price.

There are, and have been for a long time, vegetable oils on the market which are used for cooking, frying, baking and shortening in addition to Nyafat and Kea, including Crisco and Spry, and Mr. Proser was not the originator of the idea of using vegetable oils for such purposes, as Crisco had been on the market and used for that purpose for some years prior to the making of Parev Schmaltz.

Plaintiff contends that the defendant has no right to manufacture and sell Kea because, as Mr. Proser, its president, says Kea and Nyafat are used for the same

purposes, and for every can of Kea that is being sold by the defendant, one jar of Nyafat is not being sold, therefore, he complains that for every jar of Nyafat that is not being sold, he is deprived of the benefits of the contract of February 29th, 1924, pursuant to which he is entitled to a royalty upon the sale of a jar of Nyafat.

This contention, together with plaintiff's contention that the contract of February 29th, 1924, must be held to contain an implied covenant that the defendant will not sell a food product so similar in use to Nyafat as to displace that article from the consumers' market, and thus deprive the plaintiff of the benefits of the contract, that is, its royalties, and the further contention that the product Kea tends to displace Nyafat in the consumers' market, and come within the scope of such an implied negative covenant, form the basis of the controversy which this court has presented to it for its decision and will be discussed in this opinion.

The hereinbefore mentioned contract between the parties dated February 29th, 1924 (Plaintiff's Exhibit 1), in which it is recited and represented by plaintiff that Letters Patent of the United States were then pending in its favor upon its application covering a formula and process for the manufacture of a food product known as Parev Schmaltz, which was registered in the United States Patent Office; the exclusive right to use said patent, when issued, together with the said trademark registration, process and formula, were as provided by said contract to be turned over to the defendant. The said good will, process and formula of the food product were turned over to the defendant for its sole and exclusive use subject to the restrictions in said contract thereinafter expressed in manufacturing of Parev Schmaltz for a period of twenty-five years from the date of the contract in consideration of royalties to be paid to the plaintiff.

It was further provided in said contract that the food product was to be manufactured in accordance with the formula and process covered by the patent pending, and any improvement thereon that may be invented "when and as the said party of the second part shall think fit", the party of the second part being the defendant.

In the first paragraph there is a provision for the payment of royalties, which was subsequently modified, but that is of no moment except to show that royalties were to be paid.

By the second paragraph the defendant was given the option to cancel the contract within two years in the manner indicated in the contract.

The third paragraph provided for the turning over of the patent, etc., by the plaintiff to the defendant as hereinbefore cited.

The fourth paragraph provided that plaintiff should deliver the recipe in writing showing all materials, methods and processes and machinery required in the manufacture of the food product.

The fifth paragraph provided for the employment of Mr. Proser the president of the plaintiff.

The sixth paragraph provided for the keeping of accurate accounts by the defendant, the rendering of statements by it to the plaintiff in January and July of each year, and to pay the amount shown by said statements within five days after the statement was rendered.

The seventh paragraph provides that plaintiff is "not to engage, either directly or indirectly, in the manufacture or sale or distribution of the formula or process, or in any way use the formula or process for the making of the food product known as Parev Schmaltz covered by a patent pending", and that plaintiff would not engage or aid in the manufacture, sale or distribution of any products similar to Parev Schmaltz or in any business incidental thereto.

The eighth paragraph provided that plaintiff warranted the process and formula covered by the patent pending was a secret one known only to three persons mentioned, and if it should turn out at any time that the process is known to anybody other than the persons mentioned and that the article is manufactured or sold by any other, then the defendant had the option to terminate the contract in the manner provided therein.

The ninth paragraph provided that the plaintiff should give the defendant whatever assistance was needed and when required so that the defendant might be enabled to make full and complete use of the process, formula and invention as cov-

ered by the patent pending and the trademark and formula.

The tenth paragraph provided that if Mr. Proser should make any improvement or modification of the process or formula or of the method in using it, that these improvements were to be given to the defendant, and subject to all the terms and conditions of the contract, without the payment of any further royalty. It was also provided that plaintiff should give the defendant "full information respecting the mode of using the same", without any additional payments.

The eleventh and twelfth paragraphs provided for the protection of the defendant in the event of any lawsuits for the infringement of the patent rights if they were granted.

The thirteenth paragraph provided that the contract was to be terminated if there should be a judicial decision invalidating the patents.

The fourteenth paragraph requires no consideration.

The fifteenth paragraph provided that it was of the essence of the contract, and there was a specific warranty to that effect by the plaintiff, that the food product Parev Schmaltz does not conflict with the Jewish dietary laws, that it might be used in connection with meat foods and dairy food, etc. It was further specifically provided that the contract was entered into by the defendant in reliance upon such warranty.

The sixteenth paragraph provided that the contract was to be operative for twenty-five years, with the right of renewal to the defendant for another twenty-five years.

The seventeenth paragraph provides that defendant may cancel the contract before the twenty-five year period expires, by the defendant giving thirty days' written notice to the plaintiff with which notice the defendant must send a check for $500, and upon sending the notice with the check the agreement shall terminate. It also provided that within ninety days after that termination in the manner provided the defendant must deliver to the plaintiff a statement of the account between the parties, and pay it any moneys found to be due under the royalty provision.

The eighteenth and nineteenth paragraphs require no comment.

The twentieth paragraph provides as follows: "Upon the expiration of this agreement, or in the event said agreement is terminated prior thereto, the party of the second part does hereby agree to return to the party of the first part all the rights conferred upon the party of the second part by virtue of this agreement. Upon the termination or expiration of this agreement, the party of the second part does hereby agree not to engage in, directly or indirectly, in the manufacture, sale or distribution of the product Parev Schmaltz, or any product of a similar nature."

The twenty-first paragraph provided that the defendant should have the privilege of using a name other than Parev Schmaltz for the food product, and further provided, "In the event that the party of the second part shall choose a name or names other than Parev Schmaltz in connection with the sale of said food product, said name or names shall be the property of the party of the second part, and upon the expiration or termination of this Agreement, said name or names shall remain the property of the party of the second part, absolutely and forever."

The twenty-second paragraph requires no comment.

Let us for the moment consider the situation of the parties at the time the contract was made.

The plaintiff was the owner of a formula made by Mr. Aaron Proser and a trademark, Parev Schmaltz, but was not then nor has it since become the owner of a patent for the product or process Parev Schmaltz.

Mr. Proser was not the first to discover or introduce on the market a vegetable oil which could be used for cooking, frying, baking or shortening, and therefore neither he nor plaintiff can claim any right to protection against any other vegetable oil not made substantially by the same formula as Parev Schmaltz.

Plaintiff desired to put its product on the market in a large way, which required considerable money, and sought the defendant for that purpose, and of course expected to be required not to compete with the defendant, the party of the second part, with reference to vegetable oils, and not to sell, manufacture or distribute Parev Schmaltz or any similar product, as no one would lay out a considerable sum of money to put plaintiff's product on the market and have plaintiff or any of the Prosers as competitors.

690

The party of the second part was a responsible business concern of some years standing, and well known in its line, which included the sale of food products, and was willing to add plaintiff's product, made according to plaintiff's formula, to its line, and to put forth the money and effort which it believed would be necessary to put plaintiff's product on the market in a large way. It certainly did not, however, intend to limit itself to the sale, manufacture or distribution of plaintiff's product as the only vegetable oil product to be handled by it. This is apparent from the fact that nowhere in the contract is any such provision found, but also from the last portion of the third paragraph of the contract, where, after providing for the delivery of the formula and many other things belonging to the party of the first part and used in connection with the manufacture and sale of Parev Schmaltz, it provides: "to be used by the party of the second part as said party of the second part shall think fit."

Of course the party of the second part would not put forth the money and effort which was necessary to put the plaintiff's product on the market in a large way, and have plaintiff, or the three Prosers, or either of them, enter into competition with it by selling, manufacturing or distributing Parev Schmaltz or any similar product.

This is not an action for infringement, or unfair competition, but solely for an injunction restraining the party of the second part from violating a negative implied covenant of the contract not to sell, manufacture or distribute a food product so similar in use to Nyafat as to displace that article from the consumers market and thus deprive the plaintiff of the benefits of the contract, towit: its royalties.

As I have hereinbefore said, nowhere in the contract is there any provision prohibiting the defendant from selling, manufacturing or distributing any product which may be used for the same purpose as Nyafat; namely, for baking, frying, cooking or as shortening. In fact, even in the prohibitions against selling, manufacturing or distributing by plaintiff or the Prosers, it is not of any product which may be used for the same purposes as Nyafat, but of Parev Schmaltz (now known as Nyafat), or any similar product.

Even in the twentieth paragraph of the contract which imposes a prohibition on the party of the second part, the defendant,

after the expiration of the contract, it is not against the manufacture, sale and distribution of the product Parev Schmaltz, or any product that may be used for the same purposes as Parev Schmaltz, but of Parev Schmaltz or any product of a similar nature.

It must be apparent that the defendant did not intend to agree, even after the expiration of the contract for any reason, not to sell, manufacture or distribute any product which might be used for the same purpose as Parev Schmaltz (Nyafat) namely for baking, frying, cooking or shortening, as that would put the defendant out of business for all time in selling, manufacturing or distributing any vegetable oil for baking, frying, cooking and shortening, no matter what the formula should be, or how widely it might differ in composition from Parev Schmaltz, the formula of Proser, which was the subject of the contract.

It is true that we have not reached the period of the termination of the contract, but nothing shows more clearly how unreasonable the contention of the plaintiff is, as to the definition of similar, than by attempting to apply it to paragraph twentieth of the contract.

Similarity of use is widely different from similarity of nature.

Those things which may differ entirely as to their constituent elements may be put to the same use.

Those things which are similar or of a similar nature are those things which are alike in their constituent elements, at least the basic constituent elements, and as I have hereinbefore shown, Nyafat and Kea differ completely in their constituent elements, and no such breadth of claim as similarity of use can be successfully made by plaintiff, as Mr. Proser was not the first to suggest vegetable oil for the purposes described, as Crisco was at the time of the making of the contract, and had been for some years, on the market, and was a vegetable oil used for cooking, frying, baking and shortening.

As I understand it, plaintiff concedes that anyone other than the defendant may legally make and sell other vegetable oils for cooking, frying, baking or shortening, such as Crisco, Spry and Kea.

██ Implied promises are to be cautiously and not hastily raised, but equity will imply negative covenants in contracts,

when the primary purpose of the contract is such that to do otherwise would contradict the intention of the parties. Such covenant, however; must be clearly implied and understood by all the parties. No implied promise should be found unless it is indispensable to carry the intention of the parties into effect. Kennerly v. Simonds, D.C., 247 F. 822, 827; Joseph v. Sulzberger, 136 App.Div. 499, 121 N.Y.S. 73; Delaware & Hudson Canal Co. v. Pennsylvania Coal Co., 8 Wall. 276, 75 U.S. 276, 19 L.Ed. 349.

As I have shown no such implied covenant as claimed by the plaintiff was the intention of the parties, as it would be broader than the express covenants of the contract, as none of them are directed to similarity of use, but to similarity of the nature of the product, that is, similarity of the basic ingredients, and there is no such similarity between Nyafat and Kea.

Both sides have submitted cases which they assert are pertinent as precedents, but in reality except in establishing certain general principles which I have hereinbefore stated, they are of little value in construing the contract in question, because the circumstances of the parties, the object to be attained, the surrounding circumstances and the words used or omitted differ so greatly that in each case the contract must be construed according to its peculiar terms.

I will, however, consider the cases cited by plaintiff as supporting its contention.

In Genet v. President, etc., D. & H. C. Co., 136 N.Y. 593, 32 N.E. 1078, 19 L.R.A. 127, cited on behalf of plaintiff, the defendant by its own negligence ruined the mine which it was working on a royalty basis, and ceased mining and paying royalties over the minimum, and although there was no express agreement compelling the defendant to mine coal or providing for a contingency where the mine was destroyed, the court found that a covenant to mine coal was implied for the period of the contract and that the plaintiff had a right of action upon that implied contract. That case is clearly distinguished from the case at bar, in which the defendant is still manufacturing, selling and distributing the product made according to plaintiff's formula, and where the plaintiff is asking the court to find an implied contract in broader terms than the contract itself, one which the parties never intended to make.

In Harper Bros. v. Klaw, D.C., 232 F. 609 cited on behalf of the plaintiff. Before the advent of motion pictures, Harper Bros., the owners of the copyright of the book "Ben Hur", licensed Klaw & Erlanger, theatrical producers, to present the story in dramatic form on the payment of royalties. After motion pictures came largely into use, Klaw & Erlanger desired to produce Ben Hur in the form of a motion picture. Harper Bros. protested, and claimed the right to present that story in motion pictures, since that right had not specifically been granted to Klaw & Erlanger in the license. Klaw & Erlanger denied that Harper Bros. had that right. Judge Hough determined that the right to present motion pictures of Ben Hur was in the public domain, and that both parties were entitled to an injunction against the other preventing the performance of Ben Hur in the form of a motion picture, and found that there was an implied covenant on the part of the plaintiffs not to use the ungranted portion of the copyright estate to the detriment, if not the destruction, of the licensee's estate. That case is clearly distinguished from the case at bar, in which plaintiff is seeking to protect a claimed right which is broader than any it ever had, and by an implied covenant drive the defendant out of a certain branch of its business which it conducted by the sale of a liquid product for the same purposes before the contract here in question was entered into.

In Foster v. Callaghan & Co., D.C., 248 F. 944, cited on behalf of the plaintiff, Mr. Foster the writer of a Treatise on Federal Practice sued the defendants, his publishers, in equity to restrain the publication by them of another Treatise on Federal Criminal Procedure, written by a Mr. Byrne. The plaintiff alleged advertisements in various forms by the publishers of Mr. Byrne's book, and neglect to advertise his work. The court held that the author and publishers were joint adventurers and that there was an implied contract by the publishers with Mr. Foster not to interfere with the sale of his books by another publication. That case is clearly distinguished from the case at bar; in the Foster case the two books were written on the same subject and in direct competition, whereas in the case at bar plaintiff's formula Nyafat is for a product of different ingredients than Kea, the article complained of, which is not similar to Nyafat and, therefore, the negative covenant claimed by plaintiff is broader than the written covenants of the contract.

In Colgate v. James T. White & Co., C.C., 180 F. 882, cited on behalf of the plaintiff, it was held that a promise to publish the facts of the plaintiff's life in a government biography carried with it the implied promise not to publish them in any other work. That case is clearly distinguished from the case at bar, in which the article, the sale of which is complained of, Kea, is different and not a similar product or a product of a similar nature with Nyafat, and the covenant which plaintiff seeks to have implied is broader in its scope than any written covenant of the contract, or any right which plaintiff has a right to have protected under that contract.

In Goldberg, 168–05 Corporation, Respondent, v. Joseph Levy and Crawford Clothes, Inc., Appellants, 256 App.Div. 1086, 11 N.Y.S.2d 315, 316 cited on behalf of the plaintiff, the matter came before the court on a motion to dismiss the complaint for failure to state a cause of action. The complaint was based on the defendant's breach of a leasehold agreement, under which rental was to be measured in part on a percentage of the gross receipts of the business. A cancellation of the lease was authorized if the defendant's gross sales for any year should not equal a fixed sum. The court held that "there was implied in the lease a covenant that the tenant would not do anything that would bring about, or that would contribute to bringing about, a reduction of the gross value of sales made in the demised premises below the point at which the tenant was given the right to cancel the lease." That case is clearly distinguished from the case at bar, where the defendant is under no covenant to manufacture any specific quantity of the product of plaintiff's formula, but under paragraph third of the contract the rights and articles belonging to the plaintiff and used in connection with the manufacture and sale of Parev Schmaltz turned over to the defendant are "to be used by the party of the second part as said party of the second part shall think fit."

Plaintiff's claim for royalties must be based upon the sale of the specified product Nyafat, and not upon the sale of a product which is not a similar product, or a product of a similar nature, and certainly no injunction should issue to prohibit under an alleged implied covenant of greater scope than the written covenants of the contract, the doing of an act by defendant which would ruin its business for all time and bring no benefit to plaintiff.

Defendant distributes but does not manufacture the product Kea, but purchases it from the manufacturer, Best Foods Inc., which manufactures it under a formula of its own, which is entirely different and dissimilar to that under which Nyafat is manufactured, and sells it to any one who desires to purchase it, and resell it to its customers.

Defendant has continued to manufacture, advertise and sell the product Nyafat in very large quantities. The profits that defendant derives from the sale of Nyafat is larger than the profit derived from the sale of Kea. Plaintiff has been paid substantial royalties of some $135,000, but with a renewed selling effort on the part of the manufacturers of Crisco and a selling effort on the part of the manufacturers of Spry, there has been a reduction of sales of Nyafat, and a consequent reduction of profit to the defendant, and of royalties to the plaintiff.

The contract as written seems to me to be clear and unambiguous, and this is more clearly apparent when you consider the description of what the party of the first part, the plaintiff, was giving, and what the party of the second part, the defendant, was receiving, towit: a secret formula for which an application had been filed which was to eventuate into a patent. I did not on the trial allow any defense that the formula was not secret, nor that the patent had not been granted, as they were not pleaded as separate defenses, but in construing the contract we cannot overlook the fact that a secret formula and an application which was to eventuate into a patent was what plaintiff ws granting, and defendant thought it was receiving, and therefore, the words, "similar product" as used in paragraph seventh, or "product of a similar nature", as used in paragraph twentieth of the contract, were used and understood as preventing that which would have been an infringement of the patent, or the use of the secret formula, and that means an article of the same or from the patent standpoint equivalent ingredients and not one of similar use. It is not the use to which the product might be put that is controlling, as contended by plaintiff.

I cannot find in the contract any express provision or suggestion that defendant may not sell any other product that may be used

for the same purpose as Nyafat, nor can I see how any such covenant or agreement may be implied.

That the rights of the plaintiff were strictly limited to its formula and not generally extended to any product capable of similar use, nor even to the benefit that might come from its marketing by defendant under a name, by which the product might gain popularity on the market as a result of defendant's efforts, is further shown by the fact that by the twenty-first paragraph of the contract the party of the second part, the defendant, is given the right to choose a name or names other than Parev Schmaltz for the product, and then follows the following provision "In the event that the party of the second part shall choose a name or names other than Parev Schmaltz in connection with the sale of said food product, said name or names shall be the property of the party of the second part, and upon the expiration or termination of this Agreement, said name or names shall remain the property of the party of the second part, to belong to the party of the second part, absolutely and forever."

The defendant, the party of the second part, and not the plaintiff, the party of the first part, was by said contract, paragraph third, given the right to determine the amount of the product Nyafat that should be manufactured and sold, as after giving the party of the second part, the defendant, the sole right to use the formula for the manufacture of Nyafat it provided "to be used by the party of the second part, as said party of the second party shall think fit."

That was not an unusual type of agreement.

■ Where the right is given to one party to a contract to determine the quantity of the production, that party has the right to decide how much in quantity shall be produced or none at all. Sabarsky v. Drew, 176 App.Div. 80, 162 N.Y.S. 505.

Likewise, where one party to the contract has agreed to consign to another party all blankets of his manufacture to be sold by the latter, the former is not bound to manufacture any blankets, but would be bound to consign all that he did manufacture. William K. Hadden, et al., Respondents, v. Jeremiah W. Dimick, Appellant, 48 N.Y. 661, for reported opinion see 13 Abb.Prac., N.S., 135.

There has been no showing that the defendant has done anything to the injury of the plaintiff or other than it had the right to do under the contract.

Defendant has advertised and manufactured and sold, and is continuing to advertise, manufacture and sell, the product Nyafat. That product is Kosher and its sale has been almost exclusively to Jews who desired a product made in accordance with Jewish dietary laws, but because of the onion flavor it was not attractive to non-Jews, and although what was known as Neutral Nyafat was without the onion flavor, it had but a very limited sale. The defendant was selling Kosher products, but it desired, in addition, to attract non-Jewish customers.

Further, Crisco which antedated Nyafat by some years, and Spry, a product which was a later product than Nyafat, were more actively pushed on the market. They were made of different basic elements than Nyafat, and were cheaper than Nyafat. They met the needs of those purchasers who desired a product made in accordance with Jewish dietary laws and also non-Jews. This competition the defendant found it difficult to meet with Nyafat, and although the defendant continued to advertise, manufacture and sell Nyafat, it attempted to meet the competition and keep up its line of oil products for cooking, frying, baking and shortening, by adding Kea.

Kea was not a similar product, nor a product of similar nature to Nyafat, but was a similar product and a product of similar nature to Crisco and Spry.

Kea was not made by defendant, or under a formula provided by it, but was a product made by Best Foods Inc., under its own formula and sold to purchasers who desired to purchase, and sell it to its customers.

Since that happened the royalties paid on Nyafat by defendant have been substantially in excess of the profits earned by it on Kea.

To restrain the defendant from selling Kea if that could legally be done, would only tend to greatly injure defendant financially, if it did not compel it in fact to close out its line of oils for cooking, frying, baking and shortening, without any benefit to the plaintiff, which even if it attempted to manufacture and sell Nyafat would be compelled to compete with

694

Crisco, Spry and Kea, without the benefit of defendant's established reputation.

It seems to me that in principle the case at bar is not distinguishable from Darrasse v. Ferment Co., 182 App.Div. 591, 169 N.Y.S. 963, notwithstanding that case was an action at law, and the case at bar is a suit in equity.

The plaintiff has an adequate remedy, if the licensee does not manufacture a reasonable quantity, and the failure to manufacture a reasonable quantity be shown to be wilful and deliberate, the licensor would not be without remedy but may bring an action to rescind the contract. Callanan v. Keeseville, A. C. & L. C. R. R. Co., 199 N.Y. 268, 284, 92 N.E. 747; Dennerlien v. Martin, 247 N.Y. 145, 159 N.E. 891; Rosenwasser v. Blyn Shoes, Inc., 246 N.Y. 340, 159 N.E. 84; Tighe v. Empire Bond & Mortgage Corp., 144 Misc. 146, 258 N.Y.S. 278.

Plaintiff, if it suffers any damages for which defendant may be shown to be legally responsible, may recover the same in an action at law.

Aside from whatever rights the plaintiff may have, it cannot have an injunction against the defendant, by reason of any implied covenant not to sell based upon similarity of use, and not upon similarity of the basic constituent elements, even if any implied covenant not to sell could be found, in this case; which I believe cannot be found.

Judgment may be entered in favor of the defendant against the plaintiff dismissing the complaint on the merits, with costs.

Settle judgment on notice, and submit proposed findings of fact, and conclusions of law, in accordance with this opinion.